## CANADA'S TAVERN, INC. ET AL. *v.* TOWN OF GLEN ECHO

[No. 150, September Term, 1970.]

*Decided December 16, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*G. Vann Canada, Jr.*, with whom were *Arthur V. King* and *Shaffer, McKeever & Fitzpatrick* on the brief, for appellant Canada's Tavern, Inc.

*Philip J. Tierney, Assistant County Attorney*, with

whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellant Montgomery County.

*Rourke J. Sheehan,* with whom was *Gary H. Simpson* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 212 *infra.*

The demise of a nonconforming use and appellants' efforts to resurrect it require us to construe Section 111-57 (c) of the Montgomery County Code (1965), the pertinent part of which is:

> "* * * No nonconforming use, once abandoned, shall thereafter be re-established. For the purpose of this section, 'abandoned' shall be defined as the *cessation* of a nonconforming use for a period of six months or more." (Emphasis added.)

The facts are simple enough and they seem not to be in dispute.

For an unstated number of years Mrs. Sally Peters has been the owner of No. 2 Harvard Street in the Town of Glen Echo, which is on the north bank of the Potomac River about two and one-half miles northwesterly from the northwestern boundary of the District of Columbia. Her lot is improved by a frame building in which for a period prior to 1968 she operated, as a nonconforming use in an R-60 (single family residential) neighborhood, an establishment known as Canada's Restaurant. An injury made it impossible for her to work so in December of 1967 she leased the premises to James Dozier who continued the operation of the restaurant. Responding to public pressure the Board of License Commissioners refused to renew Dozier's liquor license which expired on 30 April 1968. Understandably bitter at this turn of events Dozier shut up shop and retired from the scene.

Efforts to find a suitable successor to Dozier were unproductive until the early spring of 1969 when the appellant Canada's Tavern, Inc. (Canada), became the lessee. It is agreed, however, that during the interregnum, no use whatever was made of the premises. Its requirements having been satisfied and the approval of the County Attorney having been obtained the Department of Inspections and Licenses, on 25 April 1969, issued to Canada a certificate of occupancy.[1] Promptly thereafter the appellee, the Town of Glen Echo (Town) filed its appeal with the County Board of Appeals (Board), charging a misinterpretation of Section 111-57 (c). The hearing took place on 17 July 1969. On 23 September the Board announced its decision, a portion of which follows:

> "Based on the testimony and exhibits of record, including the County Attorney's memorandum, Exhibit 14, the Board finds that the only issue left before it is whether or not the nonconforming use had been terminated at the time the occupancy permit was issued. Based on the evidence, the Board finds that the owner had diligently attempted to find a tenant to continue the operation of the premises as a restaurant. The restaurant remained as it had been without any change and no intention had been demonstrated that any other use would be made of the property. The only changes were alterations to comply with the safety standard, which would be permitted under the non-conforming use status. The Board cannot find that the Chief of the Building Inspection, Department of Inspection and Licenses, erred in granting the occupancy permit and hereby *sustains* his decision in issuing the permit."

---

1. The Town, in a footnote to its "Statement of Facts," indicates that Canada opened for business on 25 April 1969, the day the certificate of occupancy was issued, that it closed again around 1 September, and that on 4 November the restaurant was reopened under a new name.

The Town appealed to the Circuit Court for Montgomery County and shortly thereafter Montgomery County (County) intervened. The trial judge, Shearin, J., reversed the action of the Board. He rejected the contention of Canada and the County "that the extinguishment of a nonconforming use requires not only a cessation of such use for a period of six months or more, but an accompanying *intention* to abandon." Both Canada and the County urge us to reverse Judge Shearin and to reinstate the decision of the Board but we are satisfied that he reached the correct result.

In the appellants' argument there is discernible but one basic concept, i.e., when the District Council enacted Section 111-57 (c) it did not really mean what it said. We are prompted to paraphrase the deathless dictum of Lord Mildew—if the Council did not mean what it said, it should have said so.[2] We think the Council not only meant what it said but that the language it chose is clear and unequivocal. Nevertheless we shall consider the appellants' sophistic endeavors.

They hark back to *Landay v. Board of Zoning Appeals,* 173 Md. 460 (1938), where we said that *abandonment* "depends upon the concurrence of two, and only two, factors: one, an *intention* to abandon or relinquish; and, two, some overt *act,* or some failure to act * * *." (Emphasis added.) And, they say, we have indicated our approval of the *Landay* definition of *abandonment* in *Dorman v. Mayor and City Council of Baltimore,* 187 Md. 678 (1947); *Vogl v. Mayor and City Council of Baltimore,* 228 Md. 283 (1962); *Stieff v. Collins,* 237 Md. 601 (1965); and *Harris Used Car Co. v. Anne Arundel County,* 257 Md. 412 (1970). They continue with the citation of *McCoy v. City of Knoxville,* 41 Ill. App. 2d 378, 190 N.E.2d 622 (1963), which held that *discontinuance* means *abandonment,* adding, in support of *McCoy, Smith v. Howard,* 407 S.W.2d 139 (Ky. 1966), and *Bither v. Baker Rock Crushing Co.,* 438 P. 2d 988 (Ore. 1968).

---

2. A. P. Herbert, *Uncommon Law* 192 (1st ed. 1936). Lord Mildew is the mythical judge.

They go on to argue that since we have used *discontinuance* and *cessation* synonymously, *Landay, supra* at 467, and since *abandonment, discontinuance* and *cessation* are "cognative" (we shall assume they mean *cognate*) terms, the "existing legal requisites of *abandonment* must be merged into any general definition of [any one of] the [three] words," thus compelling the conclusion that *cessation* cannot be used without connoting intent. We are signally unimpressed with this forensic foray. Even a cursory reading of *Landay* discloses its expressed inapplicability to the case at bar. Speaking for the Court, Judge Offutt said:

> "Since the ordinance provides one way, and only one way, in which a non-conforming use may be lost, to supply another way in which such a right may be lost would be to do what the Mayor and City Council alone was authorized to do, but which it refrained from doing. *Since, therefore, the ordinance does not provide that mere cessation of the non-conforming use shall prevent its resumption, this court is not authorized to give to such cessation that effect." Id.* at 466-67. (Emphasis added.)
>
> * * *
>
> "The reasoning as well as the conclusions in these cases is consistent with the principle that, *unless so stated in the statute,* cessation or discontinuance of a non-conforming use without the substitution of another use, or without evidence of an intent to abandon the non-conforming use, will not prevent its resumption." *Id.* at 469. (Emphasis added.)

Appellants shrug off the explicit language of Section 111-57 (c) with the argument that it was enacted only for the purpose of clearing up the "time" ambiguities created by *Landay* and *Dorman.* This seems most unlikely for, if true, then, in effect, what the Council said was " 'abandoned' shall be defined as the * * * [abandon-

ment] of a nonconforming use for a period of six months or more." We think the Council, having in mind a larger purpose, intended to align itself with those local governments which have found it desirable to delete the factor of intent in respect of the abandonment, discontinuance or cessation of nonconforming uses rather than continuing to run the gamut of its judicial determination in a succession of infinitely variable factual situations.[3]

It is suggested that the use of both *abandonment* and *cessation,* in the same section, creates an ambiguity. We can think of no reason why this should be so. For instance, there is certainly no ambiguity in the Baltimore City ordinance which provides that "such discontinuance for [six consecutive months] * * * shall constitute an abandonment * * * regardless of any reservation of an intent not to abandon same or of intent to resume actual operations." We think Section 111-57 (c), while less explicit, is not less clear.[4]

> *Order affirmed.*
> *Appellants to pay the costs.*

---

3. The legislative history of Section 111-57 (c) seems to support the view we have expressed. The earliest version, enacted in September 1941, appears in the 1950 Montgomery County Code as Sec. 176-10. It provided that "upon * * * discontinuance * * * for a period of one year * * * [the use] shall terminate." Following a 1953 amendment it appears in the 1955 Code as Section 107-47 (c), which provided that "no nonconforming use, once abandoned, shall thereafter be re-established" and defining "abandonment * * * as the *cessation*" of the use *"for one month or more."* (Emphasis added.) The present section, 111-57 (c), is a re-enactment (without change) of Section 104-48 (c) of the 1960 Code.

4. It is interesting to note the diverse approaches other counties have taken in attacking nonconforming uses which have ceased for one reason or another. This diversity is all the more reason for reading such ordinances literally without attempting to extract strained interpretations. "[I]n the case of the *abandonment* of such non-conforming use for the period of one year, the right to continue such original non-conforming use shall cease." Code of Anne Arundel County, § 13-310 as amended Supp. #5 (1969). "[On] any *abandonment* or *discontinuance* of such non-conforming use for a period of one year or more * * * the right to continue or resume such non-conforming use shall terminate." Baltimore County Zoning Regulations (1955) § 104.1. "No building, structure or premises where a non-conforming use *has ceased* for six (6) months or more shall thereafter be used * * *." Carroll County Zoning Ordinance § 4.3 (d). "No building, structure or

BARNES, J., dissenting:

I dissent because, in my opinion, the majority has misinterpreted § 111-57 (c) of the Montgomery County Code, 1965, and has not perceived the correct legislative intent of that statutory provision.

In seeking to ascertain the legislative intent in a statutory enactment, we properly assume that the legislators are familiar with the existing law—both statutory and decisional—and enact the legislation within the framework of that law. *Giant Food, Inc. v. Gooch,* 245 Md. 160, 225 A. 2d 431 (1967) ; *St. Joseph Hospital v. Quinn,* 241 Md. 371, 216 A. 2d 732 (1966) ; *Gibson v. State,* 204 Md. 423, 104 A. 2d 800 (1954).

Since the landmark case in regard to abandonment of nonconforming uses, *Landay v. Board of Zoning Appeals,* 173 Md. 460, 196 A. 293 (1938), and continuing through the decision of the Court in *Harris Used Car Co. v. Anne Arundel County,* 257 Md. 412, 263 A. 2d 520 (1970), there has been no doubt that such abandonment consists of two elements (1) an intention to abandon or relinquish and (2) some overt act, or some failure to act, which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment. It is in this judicial setting that § 111-57 (c) was enacted.

With this well established law in mind, Subsection (c) should be carefully considered. It provides:

"(c) No building in which a nonconforming use has been changed in whole or in part to a more restricted use shall again be devoted to a less restricted use. No nonconforming use, once

premises where a non-conforming use *has ceased* for two years or more shall again be put to a non-conforming use." Code of Frederick County (1959) as amended § 40-124. "A nonconforming use * * * which shall *remain idle* and *unused* for a continuous period of three years, *shall be considered abandoned* as a non-conforming use * * *." Zoning Regulations of Howard County (1961) as amended § 20.05. "No non-conforming use may be re-established * * * where such non-conforming use *has been discontinued* for a period of at least two years." Zoning Ordinance of Prince George's County (1949) as amended § 12.41 (b). (All emphasis added.)

abandoned, shall thereafter be re-established. For the purpose of this section, 'abandoned' shall be defined as the cessation of a nonconforming use for a period of six months or more."

It will be observed that there is no *express* negation of the first and vitally important element of abandonment, *i.e.*, the intent by the owner of the vested property right to abandon it. The legislature does not state in the definition of abandonment that "cessation of" *the operation of the business conducted under* "a nonconforming use," or "cessation," *regardless of an intention to abandon,* "of a nonconforming use," or use the language of the Baltimore City Zoning Ordinance quoted by the majority "regardless of any reservation of an intent not to abandon same." In short, the language of subsection (c) in question is subject to interpretation, as it possibly could mean "regardless of intent," or it could mean that the first judicially established element of abandonment is not disturbed, and as argued by the appellants, the six months' provision in subsection (c) is merely to set a *fixed* time period for intentional abandonment rather than a *reasonable* time. In *Landay,* a reasonable time was held to be more than the three years which had elapsed because of existing economic conditions. In my opinion, the argument of the appellants is far from "sophistic" as the majority suggests. Rather, with respect, as I see it, the position of the majority is too simplistic and appears to represent the view of a minority of the jurisdictions in this country.

Many zoning ordinances provide that if there has been a "discontinuance" of the nonconforming use for a given period, the property may not thereafter be used for the nonconforming use. The cases construing such ordinances are closely in point with the present case inasmuch as Webster's, International Dictionary (2nd Ed.) defines the word "cessation" as "1. A ceasing or *discontinuance,* as of action, whether temporary or final; a stop. . . ." "Syn.—Rest, stay, pause, lull, *discontinuance,* . . ." (Emphasis supplied.)

In 1 Anderson, *American Law of Zoning,* § 6.61 (1968 Ed.), it is stated:

> "The requirement of intent to abandon is the most imposing obstruction to municipal attempts to terminate nonconforming uses which have been dormant for a period of time. Some draftsmen, in an apparent attempt to solve the problem, have included a provision that a nonconforming use may not be resumed after it has been discontinued for a specified period. . . .
>
> * * *
>
> "However, most municipalities have had little success with the device. The Courts have merged the terms 'abandon' and 'discontinuance' and *require proof of intent to abandon. . . .*"
> (Emphasis supplied.)

In Rathkopf, *The Law of Zoning and Planning* (Third Edition), § 61-3 the learned author states:

> "Some courts have upheld zoning ordinances containing a provision that a non-conforming use shall terminate and may not be resumed if non-use thereof shall have existed for a specified period, where the specified period seemed reasonable.
>
> "Other courts, however, have held that even under such ordinance provisions it must be found that the period of non-use must have been with an intent to abandon and where the non-use was caused by circumstances beyond the owner's control, the ordinance provision is ineffectual.
>
> "The circumstances attendant upon a cessation of use may either indicate an intention to abandon the previously existing use or may negative such intent by indicating an intention to resume such use. The decisions deal with both aspects."

A carefully considered case expounding and enunciating what apparently is the view in a majority of jurisdictions is *McCoy v. City of Knoxville*, 41 Ill.App.2d 378, 190 N.E.2d 622 (1963). In the *McCoy* case, a declaratory judgment was sought by the owners of land in the City of Knoxville, Illinois on which a gasoline filling station had been erected to determine its status in view of the applicable zoning law, adopted January 6, 1958. When the owners purchased the property in 1950, it had been occupied and used for filling station purposes and was bought subject to a lease to the Sinclair Refining Company for filling station purposes covering the period December 3, 1949, to December 2, 1959. The land was used for filling station purposes until February 28, 1958, when Sinclair suspended the operation of the filling station, after which time it was not actually used as a filling station although the usual facilities for such use were not removed. After 1959 when the Sinclair lease expired, the owners made numerous attempts to lease the property for operation as a filling station and to sell it for such purposes. They finally obtained a buyer for the property, the sale being conditioned, however, upon a judicial determination that the property could be used for filling station purposes in view of a provision of the applicable zoning ordinance which provided, in relevant part (after stating that lawful uses of property may be continued even though they do not conform to the zoning) :

> "In the event that the nonconforming use of a building or premises is discontinued for a period of two years or more, such building or premises shall thereafter be used only in conformity with the regulations of the district in which it is located."

The Court, in reversing the lower court, held that the statutory word "discontinuance" meant more than a mere suspension of use and the addition of the words "for a period of two years or more" did not alter the requirement that an intention to abandon the nonconforming use

by the owner must be established. The Court noted that there were cases to the contrary but stated that these decisions were "not the law of Illinois or the majority view."

To the same effect, see *Smith v. Howard,* Ky., 407 S.W.2d 139 (1966). *Bither v. Baker Rock Crushing Co.,* 249 Ore. 640, 438 P. 2d 988 (1968)—modified on other grounds; 249 Ore. 640, 440 P. 2d 368 (1968). *Crandon v. State,* 158 Fla. 133, 28 So. 2d 159 (1946) and *Ullman v. Payne,* 127 Conn. 239, 16 A. 2d 286 (1940).

What seems to be the minority view is represented by *Franmor Realty Corp. v. LeBoeuf,* 279 App. Div. 795, 109 N.Y.S.2d 525 (1952), affirming the Supreme Court, Nassau County, 104 N.Y.S.2d 247 (1951). The opinion of the Appellate Division consists of 13 lines, which contain no reasoning and cites no cases. The question does not appear to have been passed upon by the Court of Appeals of New York. Indeed, the decision in *Franmor* seems to have been limited in scope by subsequent New York cases. See *Amzalak v. Incorporated Village of Valley Stream,* 220 N.Y.S.2d 113 (1961) and *Gauthier v. Village of Larchmont,* 291 N.Y.S.2d 584 (1968).

*Franmor,* however, was cited with approval by the Supreme Court of Wisconsin in *State, ex rel. Peterson v. Burt,* 42 Wis. 2d 284, 166 N.W.2d 207 (1969) in the construction of a zoning ordinance of the City of Madison, Wisconsin providing that if a building used for a nonconforming use was "discontinued for a continuous period of one year, it shall not thereafter be occupied or used" except in conformity with the use regulations in the district in which it was located. There was, however, no discussion of the case or analysis of the applicable law generally.

See *State, ex rel. Brizes v. DePledge,* 81 Ohio L.Abs. 463, 162 N.E.2d 234 (1958) in regard to a zoning ordinance of the City of Eastlake, Ohio, providing in regard to "Abandonment of Buildings," that "A nonconforming building which is or hereafter becomes vacant and remains unoccupied for a period of one year" shall not

thereafter be used except in conformity with the use regulations in the district.

The evidence in the present case establishes that the building on the subject property where the nonconforming restaurant use was permitted was obviously designed for the permitted restaurant nonconforming use.

Although originally constructed as a dwelling, the building on the land had been structurally converted to a restaurant use prior to the passage of the ordinance in question. The report of the Inspector of the Board of Liquor License Commissions, dated June 2, 1969, in regard to the subject property states, in part, as follows:

> "The dining room measures about 36 x 21 feet in size and contains a service bar, booths and tables capable of seating 45 patrons. There is a cigarette machine and a juke box in the dining room. The kitchen consists of two small rooms containing a cook stove, deep fry cookers, hand-wash basin, ice machine, refrigerators and a three compartment sink. There is a beverage cooler in rear of the service bar.
>
> "There are adequate rest rooms on the second floor. * * *"

Two of the photographs in the case—Exhibits 11-B and 11-F—show a substantial sign facing in two directions with the words "Canada's Restaurant" on it. There is a canopy under the sign under which there is an entrance door with a large casement bay window on the side, which indicates a restaurant use of the building. These photographs show that in the front of this entrance three automobiles are parked and there is additional area for the parking of other cars with large pieces of wood to mark the farthest end of the parking area. In short, the evidence indicates that the building on the land is "dedicated" to restaurant use; and the public was clearly advised that such restaurant use was established before that use became nonconforming by the passage of the zoning ordinance.

The suspension of operation of the restaurant was caused by the illness of the owner and the temporary inability of the owner to obtain a suitable tenant. The owner had no intention whatever to abandon the restaurant during the six-month period. She did not remove any of the restaurant fixtures, take down the sign, use the building for any use inconsistent with the restaurant use and during the entire period made all reasonable efforts to obtain a proper tenant to operate the restaurant. It was due to no fault or lack of diligence of the owner that a suitable tenant was not found or that the restaurant was not operated during the six-month period.

It must be remembered that a lawful, established property right is involved in the present case, *i.e.*, the right to use the subject property as a restaurant. Zoning laws generally are in derogation of the common law and should be strictly construed. See *Landay v. Board of Zoning Appeals*, 173 Md. 460, 466, 196 A. 293, 296 (1938), *supra*. This is particularly true where the use of the property in question is a long established and necessary use supplying the public with food—a necessary, proper, lawful and desirable use of property. I recognize that this Court has gone far—too far in my opinion—in permitting the elimination of certain types of nonconforming uses after a "reasonable amortization" period. See *Grant v. Mayor & City Council of Baltimore*, 212 Md. 301, 129 A. 2d 363 (1957) ; *Stevens v. City of Salisbury*, 240 Md. 556, 214 A. 2d 775 (1965) ; and *Minor v. Shifflett*, 252 Md. 158, 249 A. 2d 159 (1969). In my concurring opinions in both *Stevens* and in *Minor v. Shifflett, supra,* I voiced my distress at these holdings which, in my opinion, impaired vested property rights without the payment of just compensation. The holding of the majority in the present case is, in my opinion, even more extreme than the holdings in the "amortization" cases mentioned, in that a six-months' period is clearly not a reasonable time to eliminate the nonconforming restaurant use on any amortization theory—and such a theory is not asserted. But yet, without any fault or intent of the owner, the stopping of

operation of the lawful nonconforming use for the six-months' period without any change in the structure of the building for the restaurant use or any removal or sale of the chairs, tables, bars, or other restaurant facilities, is held to result in a loss of the vested property right. Curiously, this is held by the majority contrary to the action of the administrative officials of the county and, indeed, contrary to the position taken by Montgomery County, itself, as an intervening party in the case both in the lower court and before us on this appeal. I am mindful of the view that it is intended that nonconforming uses will "wither away" with the passage of time; but this is a far cry from being "yanked out" by legislative power without the payment of just compensation.

There are grave constitutional questions which arise if the element of intention is deemed to be eliminated. It is clear in the present case, as I have indicated, that the property owner had no intention whatever to abandon the nonconforming restaurant use. The owner removed no signs, structures or other facilities indicating a position inconsistent with the continuance of the nonconforming use. See *Beyer v. Mayor & City Council of Baltimore,* 182 Md. 444, 34 A. 2d 765 (1943) where a slaughter house use was deemed to have been abandoned when the owner sold all of the visible machinery, including the boilers, pipes used for refrigeration and machinery for moving carcasses from one part of the plant to another as well as taking down the smokestack — a necessary part of the building to be used in the slaughtering and meat packing use, with no attempt by the owner to replace these necessary structures and facilities.

The facts in the present case graphically show how arbitrarily, capriciously, and unreasonably the elimination of the element of intention as a statutory requirement operates. However, other factual situations may easily be envisioned which, perhaps, present even more aggravated situations. For example, if the owner of the nonconforming right operates a seasonal business such as one which exclusively caters to preparations for the

Christmas Holiday — Christmas wrapping paper, cards, decorations and the like—and the owner on January 2 of the year following Christmas closes his shop and goes to Florida for a well-earned rest for more than six months with no intention of giving up his business and with the firm intention to return in ample time to place his orders for supplies and continue his business the following Christmas, upon his return in September, he will discover that he has lost his nonconforming right to operate his seasonal business. Again, suppose a young and competent portrait painter, with a unique style and talent, owns a nonconforming studio where his patrons pose for the painting of their portraits with proper lighting, sky-lights, etc., specially designed for his work and much against his will he is drafted into the Armed Forces of the United States, serves for more than six months, and returns to discover that he has lost his nonconforming right to maintain his studio. Suppose again, that the owner of a nonconforming right to conduct what is essentially a one-man operation is kidnapped, taken to some hide-out, with no way to communicate with other persons and is not released for over six months. He too returns home to find his nonconforming right to conduct his business gone.

To my mind, it is unreasonable, arbitrary and capricious and a denial of due process of law to eliminate the vested property right without the fault of the owner and without any intention on the owner's part to give up or relinquish the vested right. *Hadacheck v. Sebastian,* 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 398 (1915); *Village of Terrace Park v. Errett,* 12 F. 2d 240 (6 Cir. 1926); *ExParte Kelso,* 147 Cal. 609, 82 P. 241 (1905) cited in *Arundel Corp. v. Board of Zoning App. of Howard Co.,* 255 Md. 78, 81, 257 A. 2d 142, 145 (1969).

Such action, in my opinion, results in the taking of the owner's property right without just compensation as prohibited by Art. III, § 40 of the Maryland Constitution.

Inasmuch as § 111-57 (c) is ambiguous in this regard, we should give it a meaning which will avoid its uncon-

stitutionality, *City of Baltimore v. Concord Baptist Church, Inc.,* 257 Md. 132, 262 A. 2d 755 (1970) ; *Deems v. Western Maryland Ry. Co.,* 247 Md. 95, 231 A. 2d 514 (1967) ; *Stevens v. City of Salisbury,* 240 Md. 556, 214 A. 2d 775 (1965) ; *Higgins v. City of Baltimore,* 206 Md. 89, 110 A. 2d 503 (1955) ; and which would also avoid an unreasonable and harsh result. *Pan American Sulphur Co. v. State Dept. of Asses. & Taxation,* 251 Md. 620, 248 A. 2d 354 (1968) ; *B. F. Saul Company v. West End Park North, Inc.,* 250 Md. 707, 246 A. 2d 591 (1968) and cases cited therein.

In my opinion, the administrative officials properly issued a permit to the owner to continue the nonconforming restaurant use; and I would reverse the order of the lower court reversing that action by the administrative officials.