DANDY CO., INC., an Indiana Corporation, D/B/A XXX Adult XXX Mini-Movie Arcade, Appellant-Defendant,

v.

CIVIL CITY OF SOUTH BEND, COUNTY–CITY COMPLEX, Appellee-Plaintiff.

No. 3–377A81.

Court of Appeals of Indiana, Third District.

March 27, 1980.

---

**5.** The State has characterized this litigation as a "friendly suit."

Harry Heppenheimer and Donald E. Wertheimer, South Bend, for appellant-defendant.

Thomas J. Brunner, Jr., and Sanford M. Brook, South Bend, for appellee-plaintiff.

HOFFMAN, Judge.

Defendant-appellant Dandy Co., Inc. (Dandy) appeals the issuance of a preliminary injunction enjoining it from operating an adult bookstore pending further court order or final hearing.

The evidence most favorable to the judgment discloses that the subject premises, a building located at 1524 South Miami Street in South Bend, Indiana, was owned by Kathryn Serkes at all times material to this litigation. In March of 1972, Serkes leased the premises to Edward Balanow who used it to operate an adult bookstore. On May 3, 1974, Balanow vacated the premises and the

Sappenfields assumed operation of the bookstore until their lease expired in November 1974. Due to Serkes' inability to find another tenant, the premises remained unoccupied from November 1974 until December 1976 when Dandy signed a three-year lease to operate an adult bookstore.

Subsequently, South Bend, Indiana Ordinance No. 6090–76 (December 14, 1976) was enacted with its effective date set for January 1, 1977. This zoning measure restricted the establishment of controlled uses by forbidding three such controlled uses to operate within 1000 feet of each other or any one such use to be established within 500 feet of a residential area. The term "controlled uses" includes eight different kinds of establishments in addition to adult bookstores. On February 14, 1977, Dandy opened its bookstore for business. Two days later, the City of South Bend (City) instituted this action for a preliminary and permanent injunction. After a hearing, the trial court entered a preliminary injunction against Dandy.

The issues tendered for resolution on this appeal include:

(1) whether a prior nonconforming use had been abandoned;

(2) whether enforcement of the ordinance improperly divested certain rights held by Dandy;

(3) whether error was committed in denial of a motion to stay of proceedings;

(4) whether Dandy was properly held in contempt of the injunction; and

(5) whether the ordinance is constitutional.

■■■ Dandy urges that the trial court erred by rejecting its defense of prior nonconforming use. The basis for this alleged error is that the prior use was never abandoned. It is well settled that the burden of proving the existence of a nonconforming use rests with the party asserting the existence of such use. *O'Banion v. State* (1969), 146 Ind.App. 223, 253 N.E.2d 739. Since evidence cannot be reweighed on appeal, reversal occurs only when the evidence is uncontradicted and will support no reasonable inference in the trial court's favor. *City of Beech Grove v. Schmith* (1975), 164 Ind. App. 536, 329 N.E.2d 605.

The trial court found that a prior nonconforming use of the premises did not exist on January 1, 1977, the effective date of the ordinance. The court also found that the prior nonconforming use terminated in November 1974 when the Sappenfields' lease expired. From these facts, the trial court concluded that the defense of prior nonconforming use was unavailing.

■■■ Proof of a pre-existing nonconforming use constitutes a defense to an action alleging the violation of a zoning ordinance as long as such use has not been terminated under the terms of the ordinance. *Ashley v. City of Bedford* (1974), 160 Ind.App. 634, 312 N.E.2d 863. Generally, zoning ordinances have no retroactive effect and work no disturbance with existing use of property. Thus, premises used for business purposes prior to the enactment of an ordinance may be continued in such use although later included in a residential district where such use is prohibited. *Lutz v. New Albany City Plan Comm.* (1951), 230 Ind. 74, 101 N.E.2d 187.

The South Bend zoning measure is in accordance with these general rules of law. South Bend, Indiana Ordinance No. 4990–68 Section 8(A) proclaims:

"The lawful use of land existing at the time of the passage of this ordinance, although such use does not conform to the provisions hereof, may be continued, but if such non-conforming use is discontinued, any future use of said premises shall be in conformity with the provisions of this ordinance."

■■■ The question of resumption of a nonconforming use presupposes that a nonconforming use existed on the effective date of zoning and that such use was discontinued for a period of time. *Lutz v. New Albany City Plan Comm., supra,* defines "existing use" as:

" '[T]he utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose; i.

e., the conduct of a business. Ordinarily an existing use for business combines two factors: (a) Construction or adaptability of a building or room for the purpose, and (b) employment of the building or room or land within the purpose.' "

101 N.E.2d 189.

It should be noted, however, that the "existence" of a nonconforming use is not necessarily the same as the "exercise" of the use. Thus, a previously established nonconforming use may be deemed to be in existence at the time of zoning even though it is not being exercised on the very day of zoning. Rathkopf, *The Law of Zoning and Planning* Ch. 58, Sec. 3 (4th ed. 1978); 82 Am.Jur.2d *Zoning and Planning* § 184 (1976); 57 A.L.R.3d 279 (1974). Consequently, a right to resume a use of premises which became nonconforming under a zoning measure, despite a period of nonexercise of the use commencing before and extending after the time of zoning, has been recognized.

For example, the active use of a barn as a stable was suspended prior to passage of the zoning ordinance in *Borough of Saddle River v. Bobinski* (1969), 108 N.J.Super. 6, 259 A.2d 727. It was held that where there has been a suspension of an actual use as opposed to a mere intention of future use, there is an existing use.

This view was also applied in *Green v. Copeland* (1970), 286 Ala. 341, 239 So.2d 770 where a restaurant owner's beer license had been suspended indefinitely prior to enactment of a zoning ordinance which prohibited the sale of beer on the premises. The owner was held to have a right to continue such nonconforming use notwithstanding the fact that beer was not being sold on the effective date of the ordinance.

Of course, if a particular use of property is discontinued before the rezoning, the right to resume it afterwards is lost since the use was not existing when the ordinance was enacted. Discontinuance, however, means more than a mere suspension of a nonconforming use. In interpreting the term "discontinuance" when used in a zoning regulation concerning the termination or resumption of a nonconforming use, the prevailing view recognizes the term as synonymous with or equivalent to "abandonment". 1 Anderson, *American Law of Zoning* § 6.61 (1968); *See also,* 57 A.L.R.3d 279.

■ It is well settled that abandonment of the right to continue a use not conforming to a zoning ordinance requires a voluntary act on the part of the owner that signifies both an intent to abandon and abandonment. Without this concurrence of intention and some voluntary act or failure to act evincing that the owner of the nonconforming use neither claims nor retains the right to exercise the use, there can be no abandonment. *Green v. Copeland, supra*; *Union Quarries, Inc. v. Board of County Com'rs* (1970), 206 Kan. 268, 478 P.2d 181; *Rudnik v. Mayers* (1972), 387 Mich. 368, 196 N.W.2d 770; *A. T. & G., Inc., v. Zoning Board of Review* (1974), 113 R.I. 458, 322 A.2d 294.

■ Dandy urges that inability to rent the premises negates any voluntary act of abandonment. Among the circumstances which have been held to excuse a cessation of the exercise of a nonconforming use is the inability to secure a tenant for the premises. *Marchese v. Norristown Borough Zon. Bd. of Adjust.* (1971), 2 Pa.Cmwlth. 84, 277 A.2d 176; *Wood v. District of Columbia* (1944), 39 A.2d 67; *Douglas v. Village of Melrose Park* (1945), 389 Ill. 98, 58 N.E.2d 864; *Landay v. MacWilliams* (1938), 173 Md. 460, 196 A. 293.

"[W]here there is a period of non-use because of the financial inability of the owner to continue in business or to find a tenant desirous of using the premises *for a purpose permissible as a non-conforming use* the requisite intent to abandon is lacking, and the right to resume the nonconforming use when opportunity presents itself is not lost." (Emphasis added.) *Smith v. Howard* (1966), Ky., 407 S.W.2d 139, at 141–142.

Although Serkes testified that she attempted to rent the premises and placed a rent sign in the building, there was absolutely no evidence that her rental efforts

during the two-year vacancy were aimed at finding a tenant to operate an adult bookstore. As the trial judge was free to weigh the evidence, he could reasonably have concluded that this omission in Dandy's case indicated that Serkes did not intend to retain a nonconforming use for the premises. This inference coupled with the two-year lapse of time supports the finding of abandonment.[1] The burden to establish a nonconforming use rested with Dandy. It offered evidence that Serkes had attempted to lease the premises and had actually secured Dandy as a tenant to operate an adult bookstore prior to the rezoning. However, merely signing a lease and beginning clean-up work by the effective date of the ordinance would not make known to the neighborhood that the premises were being used as an adult bookstore within the meaning of the rule laid down in *Lutz v. New Albany City Plan Comm., supra.* There was no substantial construction or direct adaptability of the land for the intended purpose nor was there any employment of the land within the intended purpose. At best, reasonable minds could have differed on the issue of abandonment. The finding was not contrary to law.

Alternatively, it is argued that even if the prior use was abandoned, Dandy had substantially changed its position prior to the rezoning such that enforcement of the evidence improperly divested it of certain rights. Dandy claims that signing a lease, paying a $100 deposit, obtaining keys for the premises, and incurring expenses for inventory and labor prior to the rezoning vested rights which rendered the ordinance inapplicable.

 To obtain a vested interest in a nonconforming use, a person, prior to the effective date of the ordinance proscribing such use and while violating no law, must cause either substantial construction to be made thereon or incur substantial liabilities relating directly to the intended use. *City of*

*Omaha v. Glissmann* (1949), 151 Neb. 895, 39 N.W.2d 828. In *Lutz v. New Albany City Plan Comm., supra,* appellant had signed a lease and cleared the lots in contemplation of building a service station. The court held:

"The zoning ordinance herein is, of course, subject to any vested rights in the property of appellants acquired prior to the enactment of the zoning law. But where no work has been commenced, or where only preliminary work has been done without going ahead with the construction of the proposed building, there can be no vested rights. The fact that ground had been purchased and plans had been made for the erection of the building before the adoption of the zoning ordinance prohibiting the kind of building contemplated, is held not to exempt the property from the operation of the zoning ordinance." 101 N.E.2d 190.

In the case at bar, there was no evidence of substantial construction on the premises prior to the effective date of the rezoning. Indeed, it was admitted that actual renovation of the building did not commence until after the ordinance became law. The fact that a carpenter had performed preliminary clean-up work on the premises does not change this result.

 Also, the mere execution of a lease does not create a vested right to utilize the premises for a use subsequently made nonconforming. In *City of Omaha v. Glissmann, supra,* the evidence relied upon to establish a nonconforming use showed that a lease had been signed and some preliminary grading had preceded the rezoning. The court held this evidence insufficient to establish a vested right:

"However, the purchase or leasing of lands with the intent to use them for a use then permissible under a zoning ordinance does not prevent the city from changing its zoning ordinance applicable

---

1. Since intention is necessarily an element in the concept of abandonment, it follows that lapse of time is not per se decisive of whether a nonconforming use has been abandoned but rather is one of the factors which may evidence

such an intention when connected with other acts or circumstances. *McCoy v. City of Knoxville* (1963), 41 Ill.App.2d 378, 190 N.E.2d 622; *Pioneer Insulation & Modernizing Corp. v. City of Lynn* (1954), 331 Mass. 560, 120 N.E.2d 913.

thereto as such property is always held subject to the city's lawful exercise of the police power. *See, West Bros. Brick Co. v. City of Alexandria*, 169 Va. 271, 192 S.E. 881; 16 C.J.S., Constitutional Law, § 175, p. 541; and 11 Am.Jur., Constitutional Law, § 264, p. 1000."
39 N.W.2d 833.

■ Additionally, the fact that Dandy had placed orders for merchandise does not create a vested right. Preliminary contracts are not considered to be substantial liabilities relating directly to the intended use and do not give persons a vested interest in a nonconforming use. *County of Saunders v. Moore* (1967), 182 Neb. 377, 155 N.W.2d 317.

Dandy next argues that the trial court erred in denying its motion for a stay of proceedings. When considering such a motion, the trial court is governed by Ind. Rules of Procedure, Trial Rule 62(C) which provides:

"When an appeal is taken from an interlocutory or final judgment granting, dissolving or denying an injunction, the appointment of a receiver or, to the extent that a stay is not otherwise permitted by law upon appeal, from any judgment or order for specific relief other than the payment of money, the court to which the application is made in its sound discretion may suspend, modify, restore, or grant the injunction, the appointment of the receiver or the specific relief during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. Nothing in this rule is intended to affect the original jurisdiction of the Supreme Court or Court of Appeals of Indiana."

Relief under TR. 62(C) is expressly committed to the sound discretion of the trial court. Therefore, Dandy's argument rests on whether the trial court abused its discretion.

Dandy has not demonstrated how the trial court abused its discretion other than to recite that "the preliminary injunction operates as a continuing harm and injury to this defendant-appellant".

■ In its order granting the temporary injunction, the trial court embraced the City-Council's finding that adult bookstores, when concentrated in a particular area, have a deleterious effect upon adjacent areas, causing blight and downgrading of property values. In light of this finding, it cannot be said that the trial court abused its discretion in denying a motion for stay of the proceedings. *See, Mitchum v. State* (1970), Fla., 234 So.2d 420 where the court held that in view of the findings that defendants' objective was the selling of obscene, lewd and indecent material for profit and that such activity was prima facie injurious and damaging to the morals and manners of state residents, it was not an abuse of discretion to deny defendant's motion to stay an order enjoining it from operating an adult bookstore.

■ Dandy also contends that the trial court erred in finding it to be in contempt of the preliminary injunction. The basis for this alleged error is that the trial court failed to determine that 30% of Dandy's inventory pertaining to sex does not constitute a significant or substantial portion thereof.[2]

After the preliminary injunction was ordered on February 24, 1977, Dandy closed for business while seeking a stay order which was later denied. Around March 9, 1977, the store reopened but the testimony conflicted as to what percentage of the material on display was adult in nature. Two South Bend police officers estimated that 50 to 80% of the inventory was adult in nature while the owner of Dandy calculated

---

**2.** South Bend, Inc., Ordinance No. 6090–76 (December 14, 1976) Section I(a) 1.1 provided:

"Adult Book Store means any establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas', or an establishment with a segment or section devoted to the sale or display of such material."

the figure to be 30%. On appeal, only that evidence most favorable to the judgment may be considered.

Substantial has been defined "as meaning more than seeming or imaginary". *Sylvester v. State* (1933), 205 Ind. 628, at 632, 187 N.E. 669, at 670; *Baker v. State* (1956), 236 Ind. 55, 138 N.E.2d 641. Applying this definition to the case at bar, it is clear that when Dandy reopened its business a substantial portion of its inventory was adult in nature. Consequently, the trial judge properly found Dandy to be in contempt of court.

 The remaining assertions of error involve constitutional questions. The ordinance is assailed as constitutionally infirm because it violates equal protection of the law; it constitutes a taking of property without due process of law; and it is too vague. Dandy claims that the classification of bookstores on the basis of the content of their exhibitions violates the Equal Protection Clause of the Fourteenth Amendment. This contention was disposed of in *Young v. American Mini Theatres* (1976), 427 U.S. 50, at 71–73, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310, where the constitutionality of a similar ordinance was upheld:

> "Since what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited, even though the determination of whether a particular film fits that characterization turns on the nature of its content, we conclude that the city's interest in the present and future character of its neighborhoods adequately supports its classification of motion pictures. We hold that the zoning ordinances requiring that adult motion picture theaters not be located within 1,000 feet of two other regulated uses does not violate the Equal Protection Clause of the Fourteenth Amendment." (Footnote omitted.)

 Dandy also alleges that enforcement of the ordinance deprives it of a right to operate a business and thus constitutes a taking without due process.

> " 'What is a "taking" of property within the constitutional provision is not always clear, but so far as general rules are permissible of declaration on the subject, it may be said that there is a taking when the act involves an actual interference with, or disturbance of, property rights, which are not merely consequential, or incidental injuries to property or property rights, as distinguished from prohibition of use, or enjoyment, or destruction of interests in property.' " *Brown v. State* (1937), 211 Ind. 61, at 66, 5 N.E.2d 527, at 529.

The zoning ordinance does not prohibit Dandy from operating an adult bookstore in South Bend. Indeed, the effect of the ordinance is merely to disperse the location of such businesses rather than concentrating them in limited areas. Furthermore, the premises may be available for other lawful uses not restricted by the ordinance. There was no actual or substantial interference with Dandy's right to operate a business.

 Dandy lastly maintains that the terms "substantial or significant" are too vague since it must guess what ratio of sex oriented to nonsex oriented books is permissible under the ordinance. The definition of these terms must necessarily be determined on a case-by-case basis and are therefore not capable of precise mathematical calculation. *Young v. American Mini Theatres, supra* is persuasive in this regard.

> "As already noted, the only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to be 'characterized by an emphasis' on such matter. For most films the question will be readily answerable; to the extent that an area of doubt exists, we see no reason why the ordinances are not 'readily subject to a narrowing construction by the state courts.' "

427 U.S. 61, 96 S.Ct. 2440, 2447–2448, 49 L.Ed.2d 310.

Finding no basis for reversal, the judgment of the trial court is affirmed.

Affirmed.

GARRARD, P. J., concurs with opinion.

STATON, J., dissents with opinion.

GARRARD, Presiding Judge, concurring.

I concur with the majority's upholding of the grant of injunction upon the basis of the proof necessary to support the issuance of a *temporary* injunction and I concur with the court's ruling on the stay request.

I am more concerned about the contempt finding. However, I again concur because of appellant's failure to demonstrate error. *See* Indiana Rules of Procedure, Appellate Rule 8.3(A). The brief does not even set forth the terms of the injunction upon which the contempt was predicated.

STATON, Judge, dissenting.

I dissent. The record is absolutely void of any evidence which could establish an abandonment of the non-conforming use. A vested property interest does exist. Therefore, I would reverse the judgment of the trial court with an instruction to dissolve the preliminary injunction.

The Majority Opinion predicates its abandonment conclusion upon two assumptions. Both are incorrect: 1) that a mere vacancy of premises creates an inference that the previous non-conforming use of the premises has been abandoned and that the property owner must present evidence that only tenants for the non-conforming use were sought during the vacancy to preserve the non-conforming use;[1] and 2) that the "finding" of the trial court—the non-conforming use was abandoned in November, 1974—is somehow supported by evidence in the record.[2] A mere vacancy does not create an inference of abandonment, and there is no evidence to support the "finding" of the trial court.

An inference of abandonment is negated by a vacancy of the premises and thereby preserves the non-conforming use without evidence of a contrary intent coupled with some overt act by the property holder. *Smith v. Howard* (1966), Ky., 407 S.W.2d 139. In *Smith*, the Court, quoting from *Rathkopf's Law of Zoning and Planning*, volume 2, chapter 61, section 5, stated:

> " 'A temporary cessation, even for a lengthy period, caused by circumstances over which the property owner had no control, is generally held not to constitute proof of a discontinuance in the sense of abandonment within the meaning of zoning ordinance provisions *since the circumstances themselves negate an inference of the necessary intention to abandon the use.*
>
> \* \* \* \* \* \*
>
> " 'Similarly, where there is a period of non-use because of the financial inability of the owner to continue in business or to find a tenant desirous of using the premises for a purpose permissible as a nonconforming use the requisite intent to abandon is lacking, and the right to resume the non-conforming use when opportunity presents itself is not lost.' "

(My emphasis.).

407 S.W.2d at 141–142. Smith had leased his premises to a tenant for reconstruction and repair of tractors for twenty years. Later, he leased the premise to a plumbing supply business. When the plumbing tenant terminated its use of the premises, the East Side Screw Company leased and occupied the premises. The Court held that the light industrial use, a non-conforming use, had not been abandoned.

In *Borough of Saddle River v. Bobinski* (1969), 108 N.J.Super. 6, 259 A.2d 727, the owner purchased the property "solely be-

---

1. Majority Opinion: "Although Serkes testified that she attempted to rent the premises and placed a rent sign in the building, there was absolutely no evidence that her rental efforts during the two year vacancy were aimed at finding a tenant to operate an adult bookstore. As the trial judge was free to weigh the evidence, he could reasonably have concluded that this omission in Dandy's case indicated that Serkes did not intend to retain a nonconforming use for the premises. This inference cou-

pled with the two year lapse of time supports the finding of abandonment."

2. Transcript, page 60; the trial court made the following findings:

"9. A prior non-conforming use of the building terminated in November, 1974, and was not continuous to the effective date of the Ordinance."

"10. The prior non-conforming use did not exist at the effective date of the Ordinance."

cause of the barn and the anticipated use thereof for stabling his show horses and trotters and pacers." The Court held that a showing of vacancy or non-use did not establish an intent to abandon the non-conforming use. It stated "[D]espite the lack of use of the barnstable for 27 years, the Manzes had no affirmative subjective intent to abandon the use of the structure for stabling horses."

In addition to requiring an "affirmative subjective intent" to change the non-conforming use for an abandonment, the *Borough* Court, quoting the Maryland Court of Appeals in *Chayt v. Board of Zoning Appeals* (1939), 177 Md. 426, 9 A.2d 747, adopted the following doctrine regarding nonconforming uses:

> "Where a property is built for or adapted to a particular use, the question of existing use is determined by ascertaining as near as possible the intention of the owner, in connection with the fact of a discontinuance or apparent abandonment of use; it is not to be determined on the date of the adoption of the ordinance. *Appeal of Haller Baking Co.*, 295 Pa. 257, 262, 145 A.77, 79. [9 A.2d, at 750]"

259 A.2d at 731. The *Borough* Court concluded:

> "Application of this doctrine to the facts herein, where there had been a suspension of an actual use rather than a mere intention of future use, leads this court to conclude that there was an existing use within the comprehension of the ordinance when it became effective."

259 A.2d at 732.

There is absolutely no evidence in the record indicating that Kathryn Serkes entertained an affirmative subjective intent to abandon the non-conforming use of an adult bookstore at 1524 South Miami Street during its vacancy. Her efforts were directed toward finding a tenant for the premises. She found a tenant on December 11, 1976, Dandy Corporation, and she executed a lease well before the effective date of the ordinance, January 1, 1977. From the record, it appears that the trial court treated the vacancy of the premises on No-

vember, 1974 as an abandonment of the non-conforming use. This is reversible error. As Chief Justice White observed in *County of Saunders v. Moore* (1967), 182 Neb. 377, 155 N.W.2d 317 at 319: "(A) vested interest in a nonconforming use under zoning regulations is a property right, and any statute or law purporting to take away that right is invalid." (citations omitted)

Realizing that a vested property interest could have been created between November, 1974 when the trial court found abandonment occurred and January 1, 1977, the effective date of the zoning ordinance, the Majority Opinion attempts to negate the existence of a vested property interest by applying the test in *Lutz v. New Albany City Plan Commission* (1951), 230 Ind. 74, 101 N.E.2d 187. The *Lutz* test embraces two factors: 1) adaptability of the premises for the non-conforming purpose; and 2) employment of the premises for the purpose of exercising the non-conforming use. This attempted application of the *Lutz* test by the Majority Opinion fails from a mis-application of the facts to the test.

First, the factual posture in *Lutz* is different. In *Lutz*, an undeveloped parcel of real estate had never been used for a gasoline service station. The lease provided for the construction of a two-bay service station by the lessor and periodic payments by the lessee after its completion. Construction of the service station had not commenced on the effective date of the ordinance prohibiting its use. Only preliminary plans for its construction had been finalized. The non-conforming use had not existed before or on the effective date of the ordinance. Furthermore, Judge Jasper, writing for the *Lutz* Court, noted that "until construction was commenced, there could be no vested right." (citations omitted) 101 N.E.2d at 190. Although there is no employment of the premises for the purpose of exercising the non-conforming use of the premises, a vested interest may be acquired if there has been substantial construction to prepare the premises for the exercising of the non-conforming use. *County of Saunders v. Moore, supra.*

Secondly, the factual posture of this case does not lend itself to the substantial, new construction concept use in *Lutz* to create an existing use. The building at 1524 South Miami was completely constructed. It had been adapted to the non-conforming use of an adult bookstore since 1972. The lease negotiated between Dandy Corporation and Kathryn Serkes in November, 1976 provided that Dandy could use the existing sign on the building. The lease executed on December 11, 1976 provided that the premises would be used as an adult bookstore.[3] Only two hundred twenty-five dollars worth of lumber was purchased to have the existing partitions rearranged in the storeroom.[4] This very minor construction or re-arrangement of partitions was accomplished by only one carpenter, Martin Harris. The only additional expenditure needed to fully employ the non-conforming use was the purchase of nine thousand dollars worth of magazines and racks which were ordered by Dandy on December 11, 1976.[5] Under the lease, there was nothing left for Kathryn Serkes to perform so that Dandy could use the premises as intended. The minor re-arrangement of the partitions was done and the building completely cleaned out by Martin Harris, the carpenter, in several weeks.

With these factual differences in mind, it is difficult to reconcile this conclusion by the Majority Opinion:

"It offered evidence that Serkes had attempted to lease the premises and had actually secured Dandy as a tenant to operate an adult bookstore prior to rezoning. However, merely signing a lease and beginning clean-up work by the effective date of the ordinance would not make known to the neighborhood that the premises were being used as an adult bookstore within the meaning of the rule laid down in *Lutz v. New Albany City*

*Plan Comm., supra.* There was no substantial construction or direct adaptability of the land for the intended purpose nor was there any employment of the land within the intended purpose. At best, reasonable minds could have differed on the issue of abandonment. The finding was not contrary to law."

Serkes did not attempt to lease. She did lease the premises to Dandy Corporation on December 11, 1976 after negotiating the use of the existing sign and clean-up in November, 1976.[6] Although the neighborhood's knowledge is not a factor in the *Lutz* test, it was well established by the evidence in the record that the neighborhood had reason to know that the premises had been used as an adult bookstore since 1972. It is true that there was no substantial construction. None was needed. One carpenter with two hundred twenty-five dollars worth of lumber completed the re-arrangement of the partitions and clean-up of the premises within several weeks. There was nothing substantial undertaken by Dandy in making the premises adaptable for the non-conforming use. The premises were already adapted for the use and had been so adapted since 1972. No reasonable mind could differ on the issue of abandonment, since there is no evidence to establish an abandonment of the non-conforming use, even under the most tenuous legal definition of the word.

The trial court committed reversible error when it found that a mere vacancy of the premises in November, 1974 amounted to an abandonment of the non-conforming use. Kathryn Serkes has a vested property interest in leasing her property for the non-conforming use.

I would reverse the judgment of the trial court and instruct it to dissolve the preliminary injunction.

---

3. Transcript, page 28; the lease provided: "The Lessee shall have the right to use the sign presently on the premises. . . ."

4. Transcript, page 99; Mr. Harris, the carpenter testified:

"A. The total material cost with everything was roughly around two hundred and twenty-five dollars."

When Mr. Harris inquired about a permit, he was told that he did not need one. Transcript, page 101.

5. Transcript, page 115 and page 116.

6. Transcript, pages 108 and 109.